Filed 6/22/15  In re A.A. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.A. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>M.A.,<br><br>    Defendant and Appellant. | E062332<br><br>(Super.Ct.No. RIJ105122)<br><br>O P I N I O N |

APPEAL from the Superior Court of Riverside County.  Jacqueline C. Jackson, Judge.  Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, and James E. Brown, Guy B. Pittman, and Anna M. Marchand, Deputy County Counsel, for Plaintiff and Respondent.

1

## I.  INTRODUCTION

Defendant and appellant, M.A. (Mother), is the mother of two children declared dependents of the juvenile court in January 2013:  A1, a boy, born in May 2007, and A2, a girl, born in May 2010.  Mother appeals the juvenile court's November 13, 2014, orders denying her petition for further reunification services (Welf. &  Inst. Code, § 388),[1] summarily and without a hearing, and the court's further orders terminating parental rights and placing the children for adoption (§ 366.26).

Mother claims the court erroneously denied her section 388 petition without conducting an evidentiary hearing on the petition, and further erred in declining to apply the parental beneficial exception to the statutory adoption preference at the section 366.26 hearing.  (§ 366.26, subd. (c)(1)(B)(i).)  We find no error and affirm the challenged orders.

## II.  BACKGROUND

A. *The Events Leading to the Children's Dependency*

In October 2012, A1, then age five, came to school with a bruised and swollen eye.  A1 initially said his friend had punched him, but then he said that was not true, began to cry, and would not say anything further.  A social worker went to the family home, a second-story apartment, and found it was "messy," had no electricity, and had an open window posing a safety hazard to the children.  Mother, then age 26, admitted

---

[1]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

having a history of methamphetamine use. Plaintiff and respondent, Riverside County Department of Public Social Services (DPSS), gave Mother substance abuse treatment referrals, but Mother did not seek treatment.

By the end of November 2012, Mother moved out of the family apartment without telling DPSS where she and the children were moving. In January 2013, DPSS received a report that Mother and the children were living with Mother's boyfriend and Mother was neglecting the children, including not feeding them. According to the report, Mother appeared schizophrenic; she thought her boyfriend had hidden people in the wall, she was yelling for the people to get out, and she also thought the children were "against her." She was using "meth" and not "thinking right."

When DPSS contacted Mother in January 2013, the social worker saw that A1 and A2 were not being regularly bathed because the home had no hot water or utilities. A1 hardly spoke, was withdrawn, and had not been attending school for several weeks because Mother was unable to wash his clothes or bathe him. Mother and her boyfriend had a history of domestic violence: they yelled at each other in the presence of the children, and the boyfriend had kicked in the front door. The children's biological father (Father) had been in state prison since 2010 for a domestic violence offense against Mother, and he was expected to be released in May 2013. Father was also convicted of robbery in 2008. Mother had no criminal history.

Mother initially tested negative for controlled substances, but eventually admitted that she and her boyfriend used methamphetamine and their home was not safe for the

3

children.  Mother said she often used methamphetamine when she was 13 to 16 years old, then she stopped using until after A2 was born in 2010 (when she was 24 years old), but she had since been regularly using methamphetamine.  Mother said her life "fell apart" after Father was incarcerated in 2010, and she began using methamphetamine again.  When interviewed in prison, Father said he broke up with Mother because of her methamphetamine use, and that led to the domestic violence incident that resulted in his imprisonment.  Mother spoke fondly of Father and said he had worked hard to support the family.

Mother admitted she and her boyfriend used methamphetamine while the children were in the home, but minimized the dangers it presented to the children, saying, "[i]t's not like I blew the smoke in their face[s]."  Mother thought people were following her, listening to her, and "bothering" her.  When speaking with the social worker, Mother's affect would change and was often inappropriate for the topics being discussed.  In January 2013, DPSS took A1 and A2 into protective custody and placed them in foster care.  The court ordered the children detained outside parental custody.  When the social worker took A2 from Mother, Mother "jumped" on the social worker, and the police had to intervene.

B.  *Additional Family History*

Mother and Father had an older daughter, M., born with neurological problems in November 2002 when Mother was 16 years old and Father was 15 years old.  M. and Mother were homeless, and M. was taken into protective custody because her parents

could not care for her. M. was returned to Mother after the juvenile court declined to assume jurisdiction over M. in March 2003.

Near the end of her pregnancy with M., Mother suffered from high blood pressure and seizures, was found unconscious, and was rushed to the hospital. Mother was initially not expected to survive and remained hospitalized for a long time following the November 2002 birth of M. At age 27 in 2013, Mother claimed she was still disabled from her pregnancy with M. and received disability income and food stamps. Mother had no employment history and stopped attending school during the 9th grade. Mother reported she still struggled to walk and had braces for her legs, but she did not use them.

In April 2012, it was reported to DPSS that Mother was abusing methamphetamine, exhibiting paranoia, and abusing M. Mother accused M., then age nine, of sleeping with Mother's boyfriend because M. was "dressing differently," and Mother had slapped M. in the back of the head after accusing M. of failing to adequately supervise A2. M. had not attended school for months, and Mother refused to take M. to the hospital when M. was sick because Mother had recently "beaten" M. and feared DPSS would be called. The referral was unresolved because Mother left M. in the care of M.'s maternal grandmother, and DPSS was unable to locate Mother, A1, or A2.

In August 2012, M. was placed in the care of her maternal aunt. The maternal aunt became M.'s legal guardian on May 16, 2013. In January 2013, the children's maternal grandmother was arrested for robbery. Mother reported that the maternal

grandmother struggled financially, abused controlled substances, and engaged in acts of domestic violence with different boyfriends.

C. *The Dependency Proceedings (January 2013 to November 2014)*

Following their January 2013 detention, A1 and A2 remained placed together in foster care. Mother was initially allowed twice-weekly, supervised visitation, and began visiting the children in February 2013. The juvenile court assumed jurisdiction over the children on February 28, 2013 (§ 300, subds. (b), (g)), and ordered DPSS to provide reunification services to Mother. Mother's case plan required her to complete individual counseling, parenting education, substance abuse treatment, random drug testing, and 12-step meetings, and to submit to a psychotropic medical evaluation upon the recommendation of her therapist.[2]

On July 6, 2013, Mother completed a 45-day inpatient substance abuse program, which included a parenting program, but completed only 5 out of 12 specialized therapy sessions designed to help persons with substance abuse problems "attain safety in their relationships and establish adaptive coping skills." Following her completion of the inpatient program, Mother enrolled in a 12-week aftercare program, but was terminated from it after she abruptly stopped attending. By August 2013, Mother had also failed to

_____

[2] Father was also offered services and stayed in telephone contact with the children before his May 2013 release on parole. In June 2013, Father began visiting the children and married another woman. In January 2014, Father and his new wife were arrested for possessing and selling methamphetamine. DPSS then discovered that, in June 2013, Father was arrested for making criminal threats and active gang participation, among other crimes. Father's services were terminated in April 2014, and he is not a party to this appeal.

participate in a 12-step program, random drug testing, or individual counseling, as her case plan required.

Mother's supervised visits with the children had gone well, however, and she began unsupervised visits with the children in August 2013. Mother was no longer in a relationship with her boyfriend and planned to temporarily live with the children's maternal aunt in Moreno Valley. Mother did not have suitable housing for herself or the children, and was still unemployed.

A1 and A2 adjusted well and were "comfortable" in foster care. A2 was emotionally and mentally stable, and there were no concerns regarding her well-being. A1 tested "far below basic class performance" at school, and his school recommended that he repeat kindergarten. A1 had a slight speech impediment and no behavioral problems. In February 2013, A1 underwent a psychological evaluation, which found he exhibited "highly anxious behaviors" along with symptoms of post-traumatic stress disorder, and he "crave[d] stability and consistency in his life." The children's foster parents were willing to provide permanency for the children through long-term foster care, but they were unwilling to adopt the children if they did not reunify with their parents.

At the six-month status review hearing on August 29, 2013, Mother was granted an additional six months of services. In October 2013, Mother tested positive for methamphetamine and struggled to regain her sobriety. In March 2014, Mother was living in Riverside with friends and asked that DPSS use the maternal aunt's Moreno

7

Valley address as her mailing address. Mother was on a waiting list to re-enroll in the MFI Recovery Center, the same inpatient program she completed in June 2013, because the program would provide her with "a transitional living apartment for her and the children." Mother was encouraged to participate in an outpatient program and attend Alcoholics Anonymous/Narcotics Anonymous meetings while waiting to re-enroll in the inpatient program, but she refused, saying she preferred to wait to re-enroll in the inpatient program. Another relative offered to allow Mother to live with her, but Mother declined, saying she wanted to "do it on her own."

Mother did not submit to any drug tests between July 16, 2013, and October 18, 2013. On October 19, 2013, Mother, accompanied by her new boyfriend, arrived at DPSS offices for a visit with the children, submitted to a saliva test, and tested positive for methamphetamine. When discussing what caused her relapse, Mother denied she was "an addict," and appeared not to have benefited from her services. When told she would have to submit to drug tests before each visit with the children, Mother often began to cancel the visits. In December 2013, Mother admitted she would test positive for methamphetamine.

Mother tested negative for controlled substances in January and February 2014, then failed to submit to random tests on February 24, March 12, and March 21, 2014. Mother had not attended any Alcoholics Anonymous/Narcotics Anonymous meetings. In March 2014, Mother was diagnosed with "[d]ependent [p]ersonality [d]isorder" and

8

"[d]ysthymic [d]isorder," a form of depression. On April 7, 2014, Mother enrolled for the second time in the inpatient, MFI Recovery Program.

At the contested 12-month review hearing in April 2014, the court terminated Mother's services and scheduled a section 366.26 hearing. Mother was allowed to continue to visit the children at least twice monthly. At that time, the children were in the same foster home they had been in since January 2013, and their caregivers remained unwilling to adopt them.

In August 2014, DPSS reported that A1, then age seven, had "matured a great deal in the past year." He was "helpful, thoughtful and trustworthy." He had repeated kindergarten, mastered all of the subjects, and was "very proud of his accomplishments." He reported he liked school and had lots of friends. He no longer exhibited significant signs of stress or anxiety and had no developmental delays.

A2, then age four, was still in good health and developmentally on target. She had a good vocabulary, spoke in sentences, and could hold a conversation with an adult. The children had never shown anxiety from being separated from either of their parents.

A1 had a close bond with his foster parents, but understood that they were not his adoptive parents. He admired his foster father so much he said he wanted to be a "foster dad" when he grew up. A1 and A2 understood and accepted that they would not be returned to either of their parents. When asked whether he wanted to be adopted by a single woman who had expressed an interest in adopting A1 and A2, A1 expressed "a

strong preference" for being adopted by a two-parent family so that he and A2 would have a mother and a father.

The children's maternal aunt and legal guardian of their older sister M. was not willing to adopt the children, in part because her home was too small and she also had a son with autism. There were no other relatives able or willing to adopt the children. Initially, the children had unsupervised visits with the maternal aunt, but those ceased when DPSS suspected the maternal aunt was allowing Mother to see the children when Mother was using methamphetamine. The children only had a few visits with their older sister M.

The section 366.26 hearing was continued from August 12, 2014, to November 13, 2014. On August 8, A1 and A2 were matched with adoptive parents, moved into the adoptive home on August 14, and were happy in the home. By November 2014, there was "already" evidence of a strong bond between the children and their adoptive parents, and the parents were ready to adopt the children. The children were calling their adoptive parents "mommy and daddy," and looked to them for love, affection, and protection. The children expressed fear about being removed from the adoptive parents' home, and told their therapists they did not want to return to either parent's home. Mother continued to have twice-monthly, supervised visits with the children. She did not have a telephone or a suitable home for herself or the children, and DPSS had difficulty contacting her to schedule visits.

D. *Mother's Section 388 Petition and the Section 366.26 Hearing (November 13, 2014)*

Mother filed a section 388 petition on November 13, 2014, before the section 366.26 hearing, seeking further services and asking the court to vacate the hearing. Mother claimed she had completed her case plan, was maintaining sobriety, consistently visited the children, and lived with the maternal aunt, whom Mother claimed could provide a stable home for Mother and the children. She also claimed she and the children had always shared a parent/child bond.

In support of her petition, Mother submitted evidence that she had completed the "MFI Recovery Center" program, for the second time, in May 2014, and the program awarded her certificates in "Trauma, Criminal Addictive Thinking, Triple P Parenting, Matrix Relapse Prevention, Matrix Early Recovery, Co-dependency, Domestic Violence, Anger Management, and Self Esteem." An August 5, 2014, letter confirmed that Mother tested negative for drugs on two occasions before August 5, 2014, and was "expected to complete 3 months of aftercare."

Before the section 366.26 hearing, Mother's counsel asked the court to grant the petition, noting Mother had been living with the maternal aunt since August 2014 and had shown she had "stability" and "a lot of support" from relatives. Counsel argued that, although the children said they wanted to live in a stable, two-parent home, they had not been asked whether they preferred that option over living with Mother. Counsel submitted that the children's best interests would be served by being returned to Mother rather than "living with . . . strangers and being brought up by strangers."

11

County counsel asked the court to deny the petition on the grounds it was not in the children's best interests, and the children had clearly expressed that they wanted to remain with their adoptive parents. County counsel also argued no exceptions to the adoption preference applied, and the court should terminate parental rights and place the children for adoption. Minor's counsel added that A1's psychological evaluation indicated he suffered from post-traumatic stress disorder after living with Mother and he "crave[d]" consistency and stability.

The court summarily denied the petition on the ground it did not promote the best interests of the children. Proceeding to the section 366.26 hearing, the court terminated parental rights and selected adoption as the children's permanent plan, after rejecting Mother's claim that the parental benefit exception applied.

## III. DISCUSSION

### A. *Mother's Section 388 Petition Was Properly Denied Without an Evidentiary Hearing*

Mother first claims the juvenile court erroneously denied her section 388 petition summarily and without conducting an evidentiary hearing on the petition. We disagree.

#### 1. Applicable Law

Section 388 allows a parent of a dependent child to petition the juvenile court to change or modify any previous order of the court based on a showing of changed circumstances or new evidence, and requires the court to hold a hearing on the petition, "[i]f it appears that the best interests of the child . . . may be promoted by the proposed change of order . . . ." (§ 388, subds. (a), (d).) Thus, the court may deny a section 388

12

petition summarily, without a hearing, if the petition fails to make a prima facie showing that the relief requested *might* be in the best interests of the children. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 461.) The court must liberally construe the petition in favor of granting a hearing, however. (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079 [Fourth Dist., Div. Two]; *In re Marilyn H.* (1993) 5 Cal.4th 295, 309-310.)

We review the summary denial of a section 388 petition for an abuse of discretion. (*In re Marcos G.* (2010) 182 Cal.App.4th 369, 382.) If the petition fails to make the required prima facie evidentiary showings, its summary denial without a hearing does not violate the petitioner's due process rights, as a matter of law. (See *In re Angel B., supra*, 97 Cal.App.4th at pp. 460-461.)

2. <u>Analysis</u>

The juvenile court properly declined to hold an evidentiary hearing on Mother's section 388 petition. Indeed, the court heard argument on the petition, and Mother's counsel did not offer to present any additional evidence that was not presented in the petition. Thus, there was no additional evidence for the court to consider.

Further, the petition was properly denied without an evidentiary hearing because it did not make a prima facie evidentiary showing that granting it *might* be in the best interests of the children. (*In re Angel B., supra*, 97 Cal.App.4th at p. 461.) Indeed, the record shows Mother did not have a stable home for herself or the children, and her sobriety was newly found and fragile. The court did not abuse its discretion in concluding that granting Mother more services and another chance to reunify with the

13

children was not in the best interests of the children. The children had been out of Mother's custody for nearly two years, while Mother continued to use methamphetamine and live a transient lifestyle, and it was time to find a stable, adoptive home for the children.

B. *The Court Properly Refused to Apply the Parental Benefit Exception*

Mother also claims the court erroneously declined to apply the parental benefit exception to the adoption preference, based on her regular visitation and parental bond with the children. Again, we find no error.

1. Applicable Law

At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) Permanent plans include adoption, guardianship, and long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296.) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) Adoption requires terminating the parental rights of the child's parents. (*Id.* at p. 574.)

To avoid termination of parental rights and adoption, a parent has the burden of showing that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply. (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.) These exceptions permit the court "to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

14

The parental benefit exception applies when two conditions are shown:  the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  The relationship must be a *parental* one, not merely a pleasant relationship with a shared, emotional bond.  (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.)  To prove the child would benefit from continuing the parental relationship, the parent must show "either that (1) continuation of the parent-child relationship will promote the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents [citation] or (2) termination of the parental relationship would be detrimental to the child."  (*In re Angel B., supra,* 97 Cal.App.4th at p. 466.)

"'The balancing of competing considerations must be performed on a case-by-case basis and take into account many variables, including the age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.  [Citation.]'"  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1349-1350.)  "If severing the existing parental relationship would deprive the child of 'a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.'  [Citation.]"  (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1235.)

Our state appellate courts have traditionally applied the substantial evidence or the abuse of discretion test in considering challenges to juvenile court determinations that the

15

parental benefit exception did not apply. (*In re Scott B., supra,* 188 Cal.App.4th at p. 469.) As one court explained: "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that . . . no judge could reasonably have made the order that he did.' . . .'" [Citations.]" (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351.)

More recently, the appellate courts have applied a composite standard of review, recognizing that the parental benefit exception entails both factual and discretionary determinations. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [substantial evidence standard applies to the factual determination of whether beneficial relationship exists, and abuse of discretion standard applies to the determination of whether there is a compelling reason to apply the exception]; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [same].)

2. Analysis

Mother argues the case law disregards the plain language of section 366.26, subdivision (c)(1)(B)(i) and misstates the law to the extent it requires a parent to show there is a "compelling reason" to apply the parental benefit exception (e.g., *In re Bailey J., supra,* 189 Cal.App.4th at p. 1316) or that severing the parent-child relationship would "deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed" if parental rights are terminated (*In re Angel B., supra,* 97 Cal.App.4th at p. 466; *In re B.D., supra,* 159 Cal.App.4th at p. 1235). Mother points out

16

that section 366.26, subdivision (c)(1)(B)(i) requires only that the parent show that he or she (1) maintained regularly visits and contact with the child, and (2) the child would benefit from the relationship with the parent. Thus, Mother argues, the statute contains no "third" requirement that the parent show there is a compelling reason to apply the exception, or that failing to apply it would greatly harm the child.

Mother's argument misunderstands the statute and the case law interpreting and applying it. Requiring a parent to show there is a "compelling reason" to apply the exception or that the child would be "greatly harmed" if parental rights are terminated, is simply a means of requiring the parent to show the child would benefit more from continuing the parental relationship than the child would benefit from adoption. (*In re Angel B., supra,* 97 Cal.App.4th at p. 466.) If the child would benefit more from continuing the parental relationship than from adoption, or if the child would be greatly harmed if parental rights are terminated, there is necessarily a "compelling reason" to apply the exception and not terminate parental rights. (See, e.g., *In re Scott B., supra,* 188 Cal.App.4th 452 [11-year-old child's close relationship with his mother, and repeatedly stated strong preference to live with his mother, was a "compelling reason" to apply the parental benefit exception and not terminate parental rights].)

At the section 366.26 hearing, Mother did not demonstrate a compelling reason to apply the parental benefit exception. She did not show the children would benefit more from continuing their relationship with her than they would benefit from adoption. Nor did she show that the children would be greatly harmed by the termination of Mother's

17

parental rights.  Both children said they did not want to be returned to either of their parents, and they were happy in their adoptive home.  A1 was especially adamant that he wanted to be adopted by a two-parent family so that he and A2 could have a mother and a father.  At the ages of four and seven, the children very much needed the stability and permanency that an adoptive home could provide and Mother could not provide.  The court did not abuse its discretion in refusing to apply the parental benefit exception.

## IV.  DISPOSITION

The orders denying Mother's section 388 petition, terminating parental rights, and selecting adoption as the permanent plan for the children are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
J.


We concur:

HOLLENHORST
Acting P. J.

CODRINGTON
J.